IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUAN CARLOS GUERRERO,<br><br>                    Plaintiff,<br><br>        v.<br><br>BENSALEM RACING ASSOCIATION,<br>INC., et al.,<br><br>                    Defendants. | CIVIL ACTION<br>NO. 13-7420 |

## OPINION

**Slomsky, J.**                                              **June 4, 2014**

### TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................... 1

II.    BACKGROUND ..................................................................................................... 1

  A.   The Complaint.................................................................................................... 1

  B.   The State Court Action ...................................................................................... 4

III.   STANDARD OF REVIEW ..................................................................................... 5

IV.    ANALYSIS .............................................................................................................. 7

  A.   The *Rooker-Feldman* Doctrine Bars Plaintiff's Claims ................................... 8

  B.   Plaintiff Does Not Allege a Plausible Sherman Act Claim ............................. 13

     1.  Plaintiff Fails to Allege an Antitrust Injury ............................................... 13

     2.  Plaintiff Fails to Allege an Unreasonable Restraint of Competition ......... 16

     3.  Plaintiff Fails to Allege a Conspiracy to Eject Him for Ten Years ........... 18

  C.   Plaintiff Fails to Allege a Plausible Civil Rights Claim................................. 21

1.   Parx is Not a State Actor Because Parx Does Not Have a
     Symbiotic Relationship With the State ........................................................ 23

2.   Parx is Not a State Actor Because a Sufficiently Close Nexus
     Does Not Exist Between Pennsylvania's Racing Laws and the
     Term of Plaintiff's Ejection ..................................................................... 26

3.   Plaintiff Fails to Allege that Morell is a State Actor ................................... 28

D.   Tortious Interference Claim ........................................................................... 32

V.   CONCLUSION ..................................................................................................... 33

## I.    INTRODUCTION

On December 18, 2013, Juan Carlos Guerrero ("Plaintiff") filed a Complaint against the Bensalem Racing Association, Inc. and Keystone Turf Club, Inc., jointly doing business as Parx Racetrack and Philadelphia Park ("Parx"), Lance Morell, Francis McDonnell, Esquire, the Pennsylvania Thoroughbred Horsemen's Association, and Michael Ballezzi (all collectively "Defendants"), alleging antitrust and civil rights violations, as well as state claims for tortious interference with contract and business relationships.  (Doc. No. 1.)  On January 8, 2014, Defendants Bensalem Racing Association, Keystone Turf Club, Lance Morell, and Francis McDonnell, Esquire (the "Parx Defendants") filed a Motion to Dismiss the Complaint.  (Doc. No. 3.)  On February 13, 2014, the remaining Defendants, the Pennsylvania Thoroughbred Horsemen's Association and Michael Ballezzi (the "PTHA Defendants"), also moved to dismiss the Complaint.  (Doc. No. 11.)  Responses were filed to both Motions which are now ripe for disposition.[1]

## II.    BACKGROUND

### A.    The Complaint

The following facts are taken from the Complaint and are accepted as true for purposes of deciding the Motions to Dismiss.  Plaintiff is a licensed thoroughbred race horse trainer who was the leading trainer at Parx racetrack.  (Doc. No. 1 at ¶ 1.)  Bensalem Racing Association and Keystone Turf Club are the corporate entities that conduct horse racing at Parx.  (Id. ¶ 3.)  Lance Morell ("Morell") is the Director of Security for Parx, and Francis McDonnell ("McDonnell") is

---

[1] In rendering this Opinion, the Court has considered the following: the Complaint (Doc. No. 1); the Parx Defendants' Motion to Dismiss (Doc. No. 3); the PTHA Defendants' Motion to Dismiss (Doc. No. 11); Plaintiff's Responses in Opposition (Doc. Nos. 12-13); Defendants' Replies in Further Support of the Motions (Doc. Nos. 14-15); and the arguments of counsel for the parties at a hearing on the Motions held on April 17, 2014.

1

Parx's corporate counsel.  (Id. at ¶¶ 4-5.)  The Pennsylvania Thoroughbred Horsemen's Association ("PTHA") is an organization that represents the horsemen at Parx, and Michael Ballezzi ("Ballezzi") is the PTHA's Executive Director.  (Id. at ¶¶ 6-7.)

As of December 20, 2011, Plaintiff had more than forty (40) stalls at Parx, where he quartered horses during meets, free of charge.  (Id. at ¶¶ 15-16.)  According to Plaintiff, the ability to occupy free stall space gives a competitive advantage to trainers.  (Id. at ¶ 15.)  Plaintiff was a successful race horse trainer.  In 2010, his horses earned $2,522,306, and in 2011, his horses earned $3,400,295.  (Id. at ¶ 17.)  The majority of this money was earned at Parx, where Plaintiff was the leading trainer in terms of races won.  (Id.)

According to Plaintiff, his unparalleled success as a horse trainer led competitors and Defendants to suspect him of cheating.  (Id. at ¶ 18.)  However, none of his horses ever tested positive for illegal drugs.  (Id. at ¶ 19.)  Plaintiff alleges that despite his clean record, Defendants and other competitors were looking for any pretense to eliminate him from the racetrack.  (Id.)

On December 20, 2011, Plaintiff was accused of brushing the buttock of a female employee of the PTHA.  (Id. at ¶ 20.)  After this incident, Plaintiff was ejected from the racetrack for a period of ten years.  (Id. at ¶ 24.)  The Notice of Ejection set forth the following as a basis for Plaintiff's removal:

> On Wednesday, November 16, 2011, you physically assaulted a 22–year–old female Licensee while in the racetrack's administration building. There is a similar accusation from a female jockey of unlawful sexual harassment. This pattern of conduct is not in the best interest of racing and is undesirable per § 165.933 [sic] of the rules of racing.[2]

---

[2] 58 Pa. Code § 165.93 provides: "A person whether a licensee, participant or patron whose conduct is deemed detrimental to the best interest of racing, or who is deemed an undesirable person, may be excluded or expelled from the track."

<u>Guerrero v. Dep't of Agric., Pennsylvania State Horse Racing Comm'n</u>, 1378 C.D. 2012, 2013 WL 6578970, *1 (Pa. Commw. Ct. Dec. 13, 2013).  Plaintiff contends that this accusation was merely a pretense that Defendants used to eliminate him as a competitor.  (Doc. No. 1 at ¶¶ 21, 30.)  Plaintiff challenged his ejection in state court, the details of which are provided below.

According to Plaintiff, the PTHA and Parx had agreed that before Parx ejects a licensee from the racetrack, a three-person panel will hold a conference to hear the surrounding facts and will render an opinion before any action is taken.  (<u>Id.</u> at ¶ 27.)  Ballezzi or some other PTHA representative would advocate for the licensee, while a member of Parx management would represent the interests of the racetrack.  (<u>Id.</u> at ¶ 28.)  The panel would also include an independent third-party.  (<u>Id.</u>)  No pre-ejection conference was held before Plaintiff was ejected from Parx, and rather than advocate for Plaintiff, Ballezzi advocated against him.  (<u>Id.</u> at ¶ 29.)

Plaintiff contends that his ejection from Parx was part of a conspiracy by his competitors to eliminate Plaintiff as a competitor.  (<u>Id.</u> at ¶ 30.)  He claims that some of his main competitors sit on the board of directors of PTHA and benefit financially from his removal from Parx.  (<u>Id.</u>)  After his ejection, Plaintiff immediately lost his stall space at Parx.  (<u>Id.</u> at ¶ 31.)  As a result, the majority of the horse owners he worked with had to find new trainers, and Plaintiff had to look for other places to race.  (<u>Id.</u>)  Because he was ejected from Parx, many other racetracks would not let Plaintiff compete at their facilities.  (<u>Id.</u> at ¶ 32.)  In the few jurisdictions in which he was allowed to compete, Plaintiff found his horses to be non-competitive.  (<u>Id.</u> at ¶ 33.)  Owners abandoned Plaintiff, and in 2012, the horses he trained earned $566,128.  (<u>Id.</u> at ¶ 34.)  In 2013, the horses only earned $149,924.  (<u>Id.</u>)  Due to Plaintiff's ejection from Parx, his "business has been virtually destroyed and he has been deprived of millions of dollars that he would have otherwise earned."  (<u>Id.</u> at ¶ 37.)

**B.     The State Court Action**

Prior to filing the instant action, Plaintiff challenged his ejection from Parx before the

State Horse Racing Commission ("the Commission"), a division of the Department of

Agriculture.  Guerrero, 2013 WL 6578970 at *1.  On January 17, 2012, the Commission held a

hearing on the matter, and a hearing officer made the following findings of fact:

> On November 16, 2011, Stephanie Nicole Smith encountered [Plaintiff] in the
> hallway of the Administration Building located within the race grounds and
> enclosure operated by Parx.  Ms. Smith is an outgoing and affectionate person,
> who frequently exchanges hugs and kisses with people she greets, and she had a
> friendly, joking relationship with [Plaintiff], whom she met a few months after she
> began working in the Administration Building for the [PTHA].  [Plaintiff]
> questioned Ms. Smith as to whether she was going into one of the nearby offices,
> suggested she do so, and then pushed her into the empty office by placing his
> hand on her back.  [Plaintiff], standing between Ms. Smith and the door, next put
> his arm around her, held her face and kissed her, and groped her buttock.  Ms.
> Smith protested and pulled away from [Plaintiff], the two exchanged words, and
> Ms. Smith returned to her office.

Id.  (internal citations omitted).

The hearing officer also found that Plaintiff similarly had assaulted another woman at

Parx.  During the course of a Parx internal investigation in December 2011, Carie Kifer, an

apprentice jockey, informed Defendant Morell that:

> [I]n August 2010 and again in October 2010, [Plaintiff] took advantage of a hug
> between colleagues by rubbing her back, buttocks, and attempting to kiss her.  In
> both instances, Ms. Kifer communicated to [Plaintiff] that his sexual touching was
> unwelcome, unconsented to, and inappropriate, and that she was there as a
> professional to ride horses.

Id. (internal citations omitted).  Based on these facts, the hearing officer found that Plaintiff's

ten-year ejection from Parx was warranted.  Id.  On June 21, 2012, the Commission issued an

Order affirming the Notice of Ejection.  Id.

Plaintiff appealed the ejection order to the Commonwealth Court of Pennsylvania.  Id.

On December 13, 2013, the court affirmed the Commission's decision to uphold the Notice of

4

Ejection, noting that "[i]t is clear from the record that [Plaintiff] engaged in serious and offensive sexual misconduct that warranted an ejection." Id. at *6.  The court found, however, that the Commission's affirmance of the ten-year term of the ejection was an abuse of discretion and remanded the case to the Commission to reconsider the term imposed. Id.  On January 28, 2014, the Commission held another hearing to determine an appropriate ejection period.  (Doc. No. 15-2.)  On March 5, 2014, the Commission issued an Order reducing the ejection period from ten years to thirty months.  (Id. at 28.)  Plaintiff appealed this Order, and his appeal is pending before the Commonwealth Court.

Next, Plaintiff filed the instant action on December 18, 2013, five days after the Commonwealth Court of Pennsylvania affirmed his ejection from Parx.  (Doc. No. 1.)  He raises three claims in the Complaint: 1) violation of the Sherman Antitrust Act, 15 U.S.C. § 1, against all Defendants (Count I); 2) violation of 42 U.S.C. § 1983 against the Parx Defendants only (Count II); and 3) tortious interference with contract and business relations against all Defendants (Count III).  (Id.)  All Defendants in this case have filed Motions to Dismiss.  (Doc. Nos. 3, 11.)  Plaintiff opposes the Motions.  (Doc. Nos. 12-13.)  For reasons that follow, the Court will grant the Motions and dismiss the Complaint in its entirety.

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 663.  See also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp.,

5

609 F.3d 239, n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  Id.  Applying the principles of Iqbal and Twombly, the Third

Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part

analysis that a district court in this Circuit must conduct in evaluating whether allegations in a

complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a
> claim."  Second, the court should identify allegations that, "because they are no
> more than conclusions, are not entitled to the assumption of truth."  Finally,
> "where there are well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an entitlement for
> relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  "This means that our inquiry is normally broken

into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike

conclusory allegations, and then (3) looking at the well-pleaded components of the complaint

and evaluating whether all of the elements identified in part one of the inquiry are sufficiently

alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show"

such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing

Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at

679.  The "plausibility" determination is a "context-specific task that requires the reviewing

court to draw on its judicial experience and common sense."  Id.

When determining whether a claim is plausible, a district court may also consider any

affirmative defenses raised by the moving party.  "Technically, the Federal Rules of Civil

Procedure require that affirmative defenses be pleaded in the answer." Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (citing Fed. R. Civ. P. 12(b)). However, the so-called "Third Circuit Rule" allows affirmative defenses to be raised in a 12(b)(6) motion. Id. See also Ball v. Famiglio, 726 F.3d 448, 459 n.16 (3d Cir. 2013) cert. denied, 134 S. Ct. 1547 (U.S. 2014) ("[A] number of affirmative defenses that are not listed in Rule 12(b) [can] still be made by motion, provided that the basis of the defense [is] apparent on the face of the complaint."); Bethel v. Jendoco Const. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978) ("[A]n affirmative defense may be raised on a 12(b)(6) motion if the predicate establishing the defense is apparent from the face of the complaint."). For instance, a statute of limitations defense may be raised in a motion to dismiss if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Robinson, 313 F.3d at 135 (quoting Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975)). See also Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 210 n.3 (3d Cir. 2001) ("qualified immunity may be raised in a motion to dismiss at the pleading stage . . . ."); Hartmann v. Time, Inc., 166 F.2d 127, 140 n.3 (3d Cir. 1947) (explaining that the defense of res judicata may be raised in the answer or in a motion to dismiss).

## IV.   ANALYSIS

On January 8, 2014, the Parx Defendants filed a Motion to Dismiss, seeking dismissal of Counts I to III. (Doc. No. 3.) They argue that all of Plaintiff's claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. On February 13, 2014, the PTHA Defendants also filed a Motion to Dismiss, seeking dismissal of Counts I and III, which apply to them.[3] (Doc. No. 11.) In addition to

---

[3] Plaintiff only named the Parx Defendants in Count II. (Doc. No. 1 at 7.)

arguing that Plaintiff has failed to state claims upon which relief can be granted, the PTHA

Defendants contend that Plaintiff's Complaint is barred by the Rooker-Feldman doctrine,

collateral estoppel, and res judicata.[4]  The Court will address these threshold issues before

turning to the sufficiency of Plaintiff's pleading.

### A.     The Rooker-Feldman Doctrine Bars Plaintiff's Claims

In their Motion to Dismiss, the PTHA Defendants argue that under the Rooker-Feldman

doctrine, the Court does not have jurisdiction over Plaintiff's claims.  (Doc. No. 11-1 at 6-9.)

This doctrine derived its name from two Supreme Court cases which established the principle

that federal district courts may not exercise jurisdiction over suits that are essentially appeals

from state-court judgments.  Rooker v. Fid. Trust Co., 263 U.S. 413 (1923); D.C. Court of

Appeals v. Feldman, 460 U.S. 462 (1983).  In these decisions, the Supreme Court explained that

"[t]he Rooker-Feldman doctrine . . . is confined to cases . . . brought by state-court losers

complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments."

Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).  Following this line

of cases, the Third Circuit created a four-part test to determine when the doctrine divests a

federal district court of jurisdiction to consider a plaintiff's claim.

> [T]here are four requirements that must be met for the Rooker-Feldman doctrine
> to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s]
> of injuries caused by [the] state-court judgments'; (3) those judgments were
> rendered before the federal suit was filed; and (4) the plaintiff is inviting the
> district court to review and reject the state judgments.  The second and fourth
> requirements are the key to determining whether a federal suit presents an
> independent, non-barred claim.

---

[4] Since the reasons for dismissal given by the PTHA Defendants also apply to the claims against
the Parx Defendants, the Court will treat the PTHA Defendants' arguments as applicable to all
Defendants.  At the hearing on the Motion held on April 17, 2014, counsel for the PTHA
Defendants acknowledged that these arguments apply equally to the Parx Defendants.

Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010) (citing Exxon Mobil, 544 U.S. at 284).[5]

The PTHA Defendants assert that the Court does not have jurisdiction over Plaintiff's claims because in order to find for Plaintiff, the Court would have to reject the Commonwealth Court's conclusion that his ejection from Parx was warranted and lawful.  (Doc. No. 11-1 at 8.) In the Complaint, Plaintiff largely attributes the harm he suffered to his ejection from Parx.  For example:

> Some of [Plaintiff's] main competitors sit on the board of directors of PTHA and financially benefit by his ejection.  The entire ejection matter was a pretense concocted as a conspiracy by the defendants to eliminate [Plaintiff] as a competitor.

> After his ejection, [Plaintiff] immediately lost his stall space.  The majority of his owners were forced to find new trainers, and [Plaintiff] was forced to seek other jurisdictions in which to race.

> Many racetracks and jurisdictions noting [Plaintiff's] ejection from Parx would not let [Plaintiff] compete.
> ***
> This led most of [Plaintiff's] owners to abandon him . . . .

---

[5] On more than one occasion, the Supreme Court emphasized that Rooker-Feldman is a "narrow doctrine" that "applies only in 'limited circumstances.'" Lance v. Dennis, 546 U.S. 459, 464, 466 (2006) (quoting Exxon Mobil, 544 U.S. at 291).  "In light of this admonition, [the Third Circuit has] recognized that 'caution is now appropriate in relying on our pre-Exxon formulation of the Rooker–Feldman doctrine,' which focused on whether the state and federal suits were 'inextricably intertwined.'"  Great W. Mining, 615 F.3d at 169 (quoting Gary v. Braddock Cemetery, 517 F.3d 195, 200 n.5 (3d Cir. 2008)).  The Third Circuit noted that in Exxon Mobil, the Supreme Court deliberately did not rely on an analysis based on whether the plaintiff's claims were inextricably intertwined with a previous state court action.  Id. Instead, the Court applied the four-part inquiry outlined above.  Id. (citing McCormick v. Braverman, 451 F.3d 382, 394 (6th Cir. 2006) ("In Exxon, the Supreme Court implicitly repudiated the circuits' post-Feldman use of the phrase 'inextricably intertwined' to extend Rooker-Feldman to situations were [sic] the source of the injury was not the state court judgment.")).  For these reasons, the Court will apply the four-part test set forth by the Third Circuit in Great W. Mining, rather than engage in an analysis to determine whether Plaintiff's claims are inextricably intertwined with the Commonwealth Court's judgment.

(Doc. No. 1 at ¶¶ 30-32, 34.)  He contends that the alleged conspiracy to eject him from Parx violated the Sherman Antitrust Act, violated his constitutional right to due process, and constituted tortious interference with contract and business relationships.

The Court agrees with the PTHA Defendants that the Rooker-Feldman doctrine precludes this Court from adjudicating Plaintiff's claims, as they stem from the fact that he was ejected from the racetrack, a matter decided adversely against him in state court.  A review of the Complaint reveals that the four prongs of the Rooker-Feldman test are satisfied here.  First, Plaintiff lost in state court when the Commonwealth Court affirmed the Commission's decision that Plaintiff's ejection from Parx was proper.  Second, Plaintiff complains of injuries resulting from his ejection, which the state court affirmed.  Third, the Commonwealth Court's judgment that Plaintiff was lawfully ejected from Parx was rendered before Plaintiff filed the present action in federal court.[6]  Fourth, Plaintiff is inviting this Court to review and reject the state court's conclusion that Defendants' ejection of Plaintiff was warranted.  Thus, Plaintiff's Complaint is barred from review by the Rooker-Feldman doctrine.

 Plaintiff contends that Rooker-Feldman does not apply here.  In an attempt to overcome the Rooker-Feldman bar, Plaintiff argues that his claims do not arise from Defendants' decision to eject him from the racetrack.  Instead, he claims that his injuries arise from the severity of the ejection term that was imposed.  Despite Plaintiff's present contentions, nowhere in the Complaint does he allege that his injuries specifically arise from the term of ejection.  At most, Plaintiff claims that while he was ejected from Parx for ten years, "[o]ther licensees with similar

---

[6] As noted above, on December 13, 2013, the Commonwealth Court affirmed the decision to eject Plaintiff.  On December 18, 2013, five days after issuance of the decision of the Commonwealth Court, Plaintiff filed the present action.

charges [of sexual misconduct] against them were either not sanctioned at all by Parx or were ejected for much shorter terms."  (Doc. No. 1 at ¶¶ 24-25.)

Plaintiff's "manufactured effort" to re-characterize the source of his injuries is insufficient to circumvent the Rooker-Feldman bar.  See Pawlak v. Nix, No. 95-5265, 1996 WL 560360, *4 (E.D. Pa. Sept. 30, 1996) ("A manufactured effort to redefine the relief sought cannot circumvent the Rooker Feldman bar.") (citing Guess v. Bd. of Med. Examiners of State of N.C., 967 F.2d 998, 1005 (4th Cir. 1992); Stern v. Nix, 840 F.2d 208, 212 (3d Cir.) ("Despite this genuflecting to the Rooker–Feldman doctrine, closer consideration convinces us that Stern's complaint is simply a skillful attempt to mask the true purpose of the action, which essentially is to reverse the judicial decision of the Supreme Court of Pennsylvania, in contravention of Rooker–Feldman."), cert. denied 488 U.S. 826 (1988)).

Moreover, in Pawlak v. Nix, the Pennsylvania Board of Law Examiners' decided that the plaintiff, Elizabeth Pawlak, lacked the requisite character to sit for the bar examination.  Pawlak, 1996 WL 560360 at *1.  Pawlak challenged this decision as discriminatory.  Id.  The Supreme Court of Pennsylvania denied her petition and affirmed the Board's decision to refuse her admission.  Id.

Thereafter, Pawlak brought antitrust, RICO, and discrimination claims against Pennsylvania Supreme Court justices, the Board, and others.  The district court determined that Rooker-Feldman barred Pawlak's federal claims.  Id. at *6.  First, Pawlak had simply recast her state court petition into a federal action and, in essence, was once again trying to overturn the decisions denying her permission to sit for the bar exam.  Id. at *5.  Second, Pawlak attempted to avoid application of Rooker-Feldman by leaving critical facts about the state court judgment out of her Complaint and by professing to act on behalf of other bar applicants who were allegedly

11

subjected to similar discrimination.  Id.  Third, in order for the district court to determine that any of Pawlak's claims had merit, it would have had to rule that the Pennsylvania Supreme Court erred in upholding the Board's decision.  Id. at *6.  Therefore, the district court held that Plaintiff's claims were barred by the Rooker-Feldman doctrine and dismissed her Complaint.  Id.

Plaintiff's similar attempt here to avoid application of the Rooker-Feldman doctrine is equally unavailing.  In the Complaint, Plaintiff largely attributes his injuries to his ejection from Parx.  However, he now contends that he "is not seeking to overturn the ejection itself but is seeking damages for the unwarranted, unprecedented, and unlawful decision by the PTHA and Parx to conspire to eject him for a ten-year period."[7]  (Doc. No. 13 at 6.)  This is a distinction without a difference.  While the Commonwealth Court found that the Commission's affirmance of the ten-year term of ejection was an abuse of discretion, it nevertheless held that a term of ejection was warranted.  Guerrero, 2013 WL 6578970 at *6.  Under Rooker-Feldman, the Court cannot disturb this finding.  Furthermore, it is not the province of this Court to render a decision on an appropriate term of ejection.

No matter how he characterizes the source of his injury, Plaintiff's claims are barred by the Rooker-Feldman doctrine.[8]  Moreover, even if the Court were to decide this argument in his favor, Plaintiff still fails to allege plausible claims for relief, as discussed infra.

---

[7] On March 5, 2014, the Commission issued an Order, reducing the ejection period from ten years to thirty months.  (Doc. No. 15-2 at 28.)  Plaintiff contends that this reduced term of ejection is too harsh and unwarranted.  At the hearing held on April 17, 2014, Plaintiff's counsel explained that an ejection term of thirty days, sixty days, or even six months would not have had the same adverse effect on Plaintiff's horse training career.  (N.T. 4/17/14 at 44:6 – 45:1.)

[8] Because the Rooker-Feldman doctrine divests the Court of jurisdiction over this case, the Court will not address the PTHA Defendants' remaining arguments pertaining to collateral estoppel and res judicata.

**B.      Plaintiff Does Not Allege a Plausible Sherman Act Claim**

In Count I of the Complaint, Plaintiff alleges that Defendants conspired amongst themselves and with others in order to "unreasonably restrain trade to interfere with [Plaintiff's] ability to participate in the horse racing industry, to destroy or eliminate [Plaintiff's] horse racing business, and to restrain competition in horse racing" in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  (Doc. No. 1 at ¶ 39.)  Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.

The language of the statute imposes two essential requirements on an antitrust plaintiff. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314-15 (3d Cir. 2010).  "First, the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy.'"  Id. at 315 (quoting Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir. 2008)).  Second, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade."  Id.  In addition to these two requirements, an antitrust plaintiff must also allege a sufficient antitrust injury.  Id. at n.9.  In their Motions to Dismiss, Defendants argue that Plaintiff fails to state a valid antitrust claim because he does not allege plausible facts to establish the three elements of the antitrust claim: an antitrust injury, an unreasonable restraint of trade, and the existence of a conspiracy or illegal agreement.  (Doc. No. 3-2 at 6; Doc. No. 11-1 at 16.)  The Court will discuss each argument seriatim.

**1.      Plaintiff Fails to Allege an Antitrust Injury**

The PTHA Defendants argue that Plaintiff failed to allege an adequate antitrust injury. Without pleading that he suffered an antitrust injury, Plaintiff would not have standing to seek relief under the Sherman Act.  Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 75 (3d Cir. 2010).  An antitrust injury is "(1) harm of the type the antitrust laws were intended to

13

prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." Id. at 76.

Plaintiff fails to establish the first prong of an antitrust injury, that is, harm of the type the antitrust laws were intended to prevent. The antitrust laws, including the Sherman Act, were enacted "for the protection of competition not competitors." Id. at 75-76 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977)). Simply put, it is not enough for Plaintiff to have suffered harm personally. The Third Circuit has explained that:

> It is well established that an antitrust injury reflects an activity's anti-competitive effect on the competitive market. We have consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market. While a plaintiff may have individually suffered an injury as a result of defendants' actions, the antitrust laws were designed to protect market-wide anticompetitive activities.

Eichorn v. AT&T Corp., 248 F.3d 131, 140 (3d Cir. 2001) (internal citations omitted). In addition, "the antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 n.8 (1990).

First and foremost, the Complaint focuses almost entirely on the individual injuries Plaintiff allegedly suffered as a result of Defendants' actions. He repeatedly emphasizes how his horse training business was negatively impacted after he was ejected from Parx. This individual harm to Plaintiff's business is not sufficient to establish an antitrust injury. Instead, Plaintiff must allege that Defendants' conduct had a wider anticompetitive impact on the relevant geographic market. Eichorn, 248 F.3d at 140. While the Complaint contains allegations that Defendants reduced competition by denying other trainers stall space at Parx, refusing their entries, or ejecting them based on pretense (Doc. No. 1 at ¶ 42), nowhere does Plaintiff claim

14

that the length of ejections, the alleged source of the antitrust injury to him, produced an anticompetitive effect on a larger market.  In fact, the Complaint states that "[o]ther licensees with similar charges [of sexual misconduct] against them were either not sanctioned at all by Parx or were ejected for much shorter terms."  (Id. at ¶¶ 24-25.)  Plaintiff fails to explain how his "unprecedented" ejection period had a wider impact on the competitive market.

Moreover, Plaintiff fails to identify the relevant market entirely.  It is not enough for Plaintiff to make "broad allegations of harm to the 'market' as an abstract entity."  Atl. Richfield, 495 U.S. at 340 n.8.  As discussed more fully infra, Plaintiff's Complaint does just that and simply refers to the "horse racing industry" in general.  (Doc. No. 1 at ¶ 39.)

In a belated attempt to establish a sufficient antitrust injury, Plaintiff includes new factual allegations in his Response to the PHTA Defendants' Motion to Dismiss.  He contends that when trainers are expelled from the horse racing market, PTHA members can obtain higher training fees from horse owners.  (Doc. No. 13 at 12.)  According to Plaintiff, by ejecting him and other trainers from the horse racing market, Defendants have been able to set artificially high prices for training services.  (Id.)  As an initial matter, these allegations do not appear in the Complaint, which is the appropriate place for facts to be alleged and relied on by a party.  However, even considering these allegations, they would not be sufficient to plausibly establish an antitrust injury.

First, Plaintiff asserts in the Complaint that Defendants' actions were made against trainers at Parx only.  (Doc. No. 1 at ¶ 42.)  No allegation is made that either group of Defendants had the authority to expel trainers from the horse racing industry at large, as Plaintiff now contends.  Second, these new allegations would not sufficiently establish the second prong of an antitrust injury—an injury to the plaintiff which flows from that which makes defendants' acts

unlawful.  According to Plaintiff, it is unlawful for Defendants to set artificially high prices for training services.  However, Plaintiff does not complain that high prices for training services caused his injuries.  Instead, Plaintiff makes it abundantly clear that Defendants ruined his horse training business when they decided to eject him for an unwarranted period of ten years.  Nowhere does he argue that Defendants allegedly setting artificially higher prices for horse training services caused his injury.

Without this causal connection, Plaintiff would not be able to demonstrate that his injuries flow from Defendants' alleged anticompetitive conduct.  Therefore, permitting Plaintiff to amend his Complaint to include these new allegations would be futile.  Because Plaintiff cannot establish a plausible antitrust injury, he would not have standing to assert his Sherman Act claim.

### 2.    Plaintiff Fails to Allege an Unreasonable Restraint of Competition

The PTHA Defendants also argue that Plaintiff failed to adequately allege that Defendants' conduct constituted an unreasonable restraint of trade.  (Doc. No. 11-1 at 19.)  As outlined above, the second element of an antitrust claim requires Plaintiff to demonstrate that the alleged conspiracy "imposed an unreasonable restraint on trade."  Burtch, 662 F.3d at 221; In re Ins. Brokerage, 618 F.3d at 315.  This second element is analyzed under either a per se standard or a rule of reason standard.  Burtch, 662 F.3d at 221.  A practice is per se unreasonable on its face when it has "no purpose except stifling of competition."  Eichorn, 248 at 143 (quoting White Motor Co. v. United States, 372 U.S. 253, 263 (1963)).  Thus, "[p]er se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."  Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 103-04 (1984).  The per se standard

does not apply to the facts alleged here.[9]  Instead, this case will be analyzed pursuant to the rule of reason.

Most alleged restraints are analyzed under the "rule of reason" standard.  Under this standard:

> [T]he plaintiff bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market.  Because of the difficulty of isolating the [actual] market effects of challenged conduct, successful attempts to meet this burden typically include a demonstration of defendants' market power, as a judgment about market power is [a] means by which the effects of the [challenged] conduct on the market place can be assessed.

In re Ins. Brokerage, 618 F.3d at 315-16 (internal quotations omitted).

There is considerable overlap between the concept of an unreasonable restraint of trade and the antitrust injury needed to establish standing.  Like an antitrust injury, a restraint on trade will be unreasonable under the rule of reason standard if it has an adverse, anticompetitive effect within the relevant geographic market.  For the same reasons Plaintiff fails to demonstrate an antitrust injury, Plaintiff likewise cannot establish an unreasonable restraint of trade.  As noted above, Plaintiff does not identify the particular market which allegedly suffered anticompetitive effects after he was ejected from Parx.  He simply refers to "the horse racing industry" in general.  (Doc. No. 1 at ¶ 39.)  On the face of his Complaint, it is unclear whether Plaintiff is referring to the national horse racing industry, the horse racing industry in Pennsylvania, or some other jurisdiction.  Obviously, Plaintiff cannot allege harm to a market without identifying what

---

[9] An example of an "illegal per se" practice would be a horizontal agreement among competitors to fix prices or divide markets.  In re Ins. Brokerage, 618 F.3d at 316.  Without any supporting facts, Plaintiff makes bald allegations that Defendants engaged in a group boycott and in an unlawful horizontal or vertical restraint of trade and commerce.  (Id. at ¶ 40.)  Moreover, an agreement to fix prices and divide markets is not alleged here.  Simply reciting boilerplate language is insufficient.  Therefore, the Sherman Act claim will be analyzed under a rule of reason analysis.

that market is.  It also follows that by not identifying a particular market, Plaintiff is unable to demonstrate Defendants' market power within that realm.  Therefore, under the rule of reason standard, Plaintiff fails to demonstrate an unreasonable restraint of competition, which is the second element of a valid antitrust claim.

### 3.    Plaintiff Fails to Allege a Conspiracy to Eject Him for Ten Years

Lastly, Defendants argue that Plaintiff failed to adequately allege the existence of a conspiracy under the Sherman Act.  The "very essence" of a Section 1 claim is the existence of an agreement.  InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003) (quotation omitted).  "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme."  W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 99 (3d Cir. 2010) (citing Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984)).  In order to establish a Section 1 violation, Plaintiff must demonstrate that "two or more distinct entities agreed to take action against [him]."  Weiss v. York Hosp., 745 F.2d 786, 813 (3d Cir. 1984).  There can be no Section 1 violation based on unilateral conduct.  Copperweld, 467 U.S. at 768 (quotation omitted).  The Supreme Court has explained that:

> The distinction between unilateral and concerted conduct is necessary for a proper understanding of the terms "contract, combination . . . or conspiracy" in § 1.  Nothing in the literal meaning of those terms excludes coordinated conduct among officers or employees of the same company.  But it is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.  The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.  Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition.  In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively.  For these reasons, officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.

18

Id. at 769.  See also Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 894 (3d Cir. 1981)

(holding that "a corporation and its employees cannot be treated as separate entities to establish a

conspiracy under § 1"), abrogated on other grounds by Griggs v. Provident Consumer Disc. Co.,

459 U.S. 56 (1982).

Even if Plaintiff had standing to assert a Sherman Act violation, the claim would fail

because the Defendants have not engaged in concerted conduct.  Instead, Parx unilaterally

decided to eject Plaintiff for a period of ten years.  The Commonwealth Court of Pennsylvania

upheld the Commission's findings that the decision to eject Plaintiff from the racetrack, as well

as the length of the ejection, was determined solely by the Parx Defendants.[10]  Guerrero, 2013

WL 6578970 at *1-2.  After receiving a complaint that Plaintiff had assaulted a female licensee,

Lance Morell, Parx's Director of Security, began an internal investigation.  Id. at *2.  Following

his investigation, Morell spoke with the Chief Executive Officer of Parx and the Assistant

General Counsel, Francis McDonnell.  Id.  After speaking with Morell, McDonnell then

consulted with the Chief Operating Officer for Parx and decided that Plaintiff should be served

with a ten-year period of ejection for his indecent assault of the female licensee.  Id.  According

to Plaintiff, "McDonnell dictated the wording of [his] ejection and directed Morell to carry it out.

Morell's name appears as the authority who signed the actual ejection notice."  (Doc. No. 1 at

¶ 50.)

There are no allegations that the PTHA Defendants were part of the decision-making

process to eject Plaintiff for ten years in order to eliminate him as a competitor and destroy his

---

[10] In deciding a motion to dismiss, the Court may consider the allegations contained in the
Complaint, exhibits attached to the complaint, and matters of public record.  Pension Ben.
Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  Moreover, the
Court may look at judicial proceedings to resolve a 12(b)(6) motion.  Jean Alexander
Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 257 n.5 (3d Cir. 2006) (quoting S. Cross
Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999)).

career.  In fact, the factual allegations set forth in the Complaint cut against Plaintiff's assertions that the PTHA Defendants played a role in his ejection.  According to Plaintiff, "when a licensee is to be ejected <u>by Parx</u>" a three-person panel typically hears the facts and renders an opinion before any action is taken.  (Doc. No. 1 at ¶ 27) (emphasis added).  While the panel usually includes a PTHA representative to advocate for the licensee, no hearing was ever held before Parx decided to eject Plaintiff.  (<u>Id.</u> at ¶¶ 28-29.)

Based on the factual findings of the Commission, relied on by the Commonwealth Court, and the allegations in Plaintiff's Complaint, it is clear that the PTHA Defendants were not involved in the decision to eject Plaintiff for ten years.  Only the Parx Defendants were involved in this decision.  As noted above, officers or employees of the same organization cannot form a conspiracy for purposes of Section 1 of the Sherman Act.[11]  <u>Copperweld</u>, 467 U.S. at 769; <u>Tose</u>, 648 F.2d at 894.  Because Plaintiff cannot establish the "very essence" of a Section 1 violation, a conspiracy, his Sherman Act claim would fail for this reason as well.  The Court will not grant Plaintiff leave to amend his Complaint to correct these deficiencies because, as discussed <u>supra</u>, the <u>Rooker-Feldman</u> doctrine divests the Court of jurisdiction to consider Plaintiff's claims.

---

[11] There is a limited exception to this rule.  When the officers or employees of an entity act for their own benefit or personal economic interests, they are considered to be independent entities for purposes of establishing a Section 1 conspiracy.  <u>See</u> <u>Weiss</u>, 745 F.2d at 813-15.  This exception does not apply here because there are no allegations that Morell or McDonnell stood to gain financially from Plaintiff's ten-year ejection or acted out of self-interest.  Morell is Director of Security at Parx, and McDonnell serves as in-house counsel there.  Neither one of these individual defendants competes against Plaintiff as a horse trainer.  The decision to eject Plaintiff from Parx was the product of a legitimate internal investigation and a subsequent determination that Plaintiff's continued presence at the racetrack would be detrimental to the best interests of horse racing.

**C.      Plaintiff Fails to Allege a Plausible Civil Rights Claim**

In Count II of the Complaint, Plaintiff alleges that the Parx Defendants denied his constitutional right to procedural due process[12] when they failed to hold an immediate hearing before ejecting him, in violation of 42 U.S.C. § 1983 (commonly referred to as "Section 1983"). As noted previously, Plaintiff does not include the PTHA Defendants in this cause of action.

Section 1983 subjects to liability those who deprive persons of federal constitutional or statutory rights "under color of any statute, ordinance, regulation, custom, or usage" of a state. 42 U.S.C. § 1983.  "Under Section 1983, a plaintiff must plead a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law."  Phillips, 515 F.3d at 235 (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)).  In their Motion to Dismiss, the Parx Defendants argue that Plaintiff cannot maintain a Section 1983 claim against them because they are not state actors, and Plaintiff's right to procedural due process was not violated.  (Doc. No. 3-2.)  Both elements are necessary to make out a successful Section 1983 claim.

Plaintiff alleges that the Parx Defendants violated his Fourteenth Amendment right to procedural due process by failing to provide him with a hearing at a meaningful time before his ejection.  However, the Fourteenth Amendment "governs only state action, not the actions of private citizens or organizations."  Leshko v. Servis, 423 F.3d 337, 339 (3d Cir. 2005).  Thus,

---

[12] The Fourteenth Amendment of the United States Constitution provides that no State shall deprive any person of life, liberty, or property, without due process of law.  U.S. Const. Amend. XIV.  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)).  This is known as procedural due process.  Plaintiff alleges that he was not afforded a hearing until twenty-seven (27) days after his ejection from Parx.  (Doc. No. 1 at ¶ 51.)  He contends that the hearing was untimely, and this delay violated his right to procedural due process.

"private conduct, 'however discriminatory or wrongful,'" is not a basis for relief under Plaintiff's Section 1983 claim. Jackson v. Metro. Edison Co., 419 U.S. 345, 349 (1974).

Parx is a private corporation, and Morell and McDonnell are individual employees of Parx. As private parties, the Parx Defendants can only be liable for a civil rights violation under Section 1983 if their conduct can be "fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). Conduct is fairly attributable to the State under the following circumstances:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

Id. It therefore follows that to state a plausible claim under Section 1983, Plaintiff must plausibly show that the Parx Defendants were state actors.[13] Id.

Plaintiff contends that he has alleged sufficient facts to demonstrate that the Parx Defendants' conduct can be attributed to the state based on three distinct theories: 1) a symbiotic relationship exists between Parx and the State such that the actions of the Parx Defendants can be fairly attributable to the State; 2) a close nexus exists between Pennsylvania's regulation of horse racing and the Parx Defendants' decision to eject Plaintiff for ten years, making his removal from Parx fairly attributable to the State; and 3) Morell was acting as an agent of the state when he

---

[13] Plaintiff must first establish that the Parx Defendants were exercising some right or privilege created by the State. In this case, Defendants ejected Plaintiff pursuant to 4 P.S. § 325.215(c), which permits a licensed corporation like Parx to eject a licensee "whose presence [at the racetrack] is deemed detrimental to the best interests of horse racing . . . ." Thus, the first element is satisfied.

ejected Plaintiff from the racetrack.  (Doc. No. 12 at 9-12.)  The Court will address each argument in turn.

          **1.**       **Parx is Not a State Actor Because Parx Does Not Have a Symbiotic Relationship With the State**

In response to the Parx Defendants' Motion to Dismiss, Plaintiff first contends that the facts in the Complaint demonstrate the existence of a symbiotic relationship between Parx and Pennsylvania, such that Parx's conduct can be considered state action.  Courts may employ the symbiotic relationship test in order to determine whether private conduct may be fairly attributed to the State.  To do this, the Court must "look[] at the overall relationship among the parties." Cmty. Med. Ctr. v. Emergency Med. Servs., Inc., 712 F.2d 878, 881 (3d Cir. 1983).  A symbiotic relationship exists when:

> The State has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 594 (3d Cir. 1979) (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961) (finding a symbiotic relationship and holding that a privately owned restaurant's refusal to serve an African American patron constituted state action where the restaurant leased space in a garage that was financed by public funds and owned by a state agency)).

In Fitzgerald v. Mountain Laurel Racing, Inc., the Third Circuit considered whether a symbiotic relationship existed between the defendant, Mountain Laurel Racing, Inc., and the Commonwealth of Pennsylvania, such that Mountain Laurel's decision to eject a harness racing trainer from the racetrack could be considered state action.  607 F.2d at 594-96.  Fitzgerald lost his stall space at the track after Mountain Laurel management and two racing officials determined that he had violated certain Racing Commission Rules.  Id. at 593.  In an attempt to

23

demonstrate that Mountain Laurel's conduct was state action for purposes of a Section 1983

claim, Fitzgerald relied on the symbiotic relationship test set forth above.  In holding that a

symbiotic relationship did not exist, the Third Circuit explained:

> Fitzgerald vigorously asserts that the very interrelationship of the State with
> private racing associations constitutes a "symbiotic relationship" like that
> involved in <u>Burton</u> and affords him the protective embrace of the fourteenth
> amendment.  Although Mountain Laurel is a private corporation, Fitzgerald points
> to Pennsylvania's extensive regulation of racing operations requiring that track
> management and racing participants be licensed.  Furthermore, Pennsylvania
> through its Racing Commission delegates significant authority to racing officials
> who, although privately employed by the racing association, nevertheless have
> broad authorization from the State to enforce Racing Commission Rules.
> Pennsylvania also has a substantial financial interest in harness racing inasmuch
> as it collects tax revenues from the racing associations.  Fitzgerald accordingly
> concludes that harness racing is essentially a joint venture between state and
> private enterprise in Pennsylvania and that a <u>Burton</u> symbiotic relationship is
> present.
>
> ***
>
> [T]he State's relationship to the heavily regulated racing industry is not sufficient
> to establish a symbiotic relationship under <u>Burton</u>. . . . [W]e do not think the
> [State's] relationship [with Mountain Laurel] is one which makes the State a joint
> venturer with Mountain Laurel.  We cannot say that every act of Mountain Laurel
> is an act of the State.  We therefore reject Fitzgerald's claim of state action under
> <u>Burton</u>.

<u>Id.</u> at 596.  In another case, <u>Crissman v. Dover Downs Entm't Inc.</u>, 289 F.3d 231 (3d Cir. 2002),

the Third Circuit discussed the potential impact of profit-sharing on the symbiotic relationship

analysis:

> The Supreme Court has had little opportunity to address the impact on the state
> action inquiry of the flow of funds [from private entities to the state], as most
> cases have involved the flow of money from the state to private entities.  This is
> not surprising, for it would be a radical concept if the state's receipt of funds from
> private actors were to convert them into state actors.  If this were the case, the
> state's receipt of tax revenue from a private entity's operations would qualify most
> corporations as federal actors, which is surely not a desirable result.
>
> ***
>
> In sum, the presence of both these elements—regulation and flow of funds—that
> are separately unpersuasive in the state action inquiry does not amount to more
> than each alone; the combination brings no greater result—namely, no state
> action.

Id. at 244.

Here, Plaintiff essentially relies on the same arguments that were unsuccessful in

Fitzgerald and Crissman.  He contends that there is a symbiotic relationship between the State

and Parx's operations because 1) horse racing is heavily regulated and controlled by the State,

and 2) the State shares in profits generated by Defendants at Parx.  (Doc. No. 12 at 11.)  The

Third Circuit has found, however, that similar facts were not sufficient to establish a symbiotic

relationship, and this Court agrees.

Lastly, Plaintiff contends that Parx and the State enjoy a symbiotic relationship because

the State, through the Commission, carries out punishments imposed by the Parx Defendants.

(Doc. No. 12 at 11-12.)  This argument also fails because "[a]ction taken by private entities with

the mere approval or acquiescence of the State is not state action."  Am. Mfrs. Mut. Ins. Co. v.

Sullivan, 526 U.S. 40, 52 (1999) (citing Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982); Flagg

Bros., Inc. v. Brooks, 436 U.S. 149, 154-165 (1978); Jackson, 419 U.S. at 357).  It was the Parx

Defendants, not the Commission, who ejected Plaintiff from the racetrack for ten years.  The

Commission merely approved that decision and eventually reduced the ejection term to thirty

months.  Furthermore, the State simply authorizes, but does not require, private corporations like

Parx to eject licensees "whose presence [at the racetrack] is deemed detrimental to the best

interests of horse racing . . ."  4 P.S. § 325.215(c).  See also Sullivan, 526 U.S. at 52.  For these

reasons, Plaintiff cannot establish that there is a symbiotic relationship between Parx and the

State.  Parx is not a state actor under this theory.

25

2.      **Parx is Not a State Actor Because a Sufficiently Close Nexus Does Not Exist Between Pennsylvania's Racing Laws and the Term of Plaintiff's Ejection**

Second, Plaintiff asserts that there is a sufficiently close nexus between Pennsylvania's racing laws and the Parx Defendants' decision to eject him for ten years.  As the Supreme Court noted in <u>Sullivan</u>:

> [T]he private [entity] . . . will not be held to constitutional standards unless "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."  Whether such a "close nexus" exists . . . depends on whether the State "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."

526 U.S. at 52 (quoting <u>Blum</u>, 457 U.S. at 1004 (citations omitted)).  In <u>Fitzgerald</u>, the Third Circuit further explained:

> The key issue . . . is whether the State participated in the challenged conduct itself by "putting its weight" behind the challenged activity.  Without such intimate involvement by the State in the private act, there is an insufficient nexus between state and private activity to warrant a finding of state action.

607 F.2d at 597.

In <u>Fitzgerald</u>, the Third Circuit also considered whether a close nexus existed between Pennsylvania's regulation of harness racing and Mountain Laurel's removal of Fitzgerald from the track.  <u>Fitzgerald</u>, 607 F.2d at 596-600.  In determining that a close nexus existed, the Third Circuit stated as follows:

> Mountain Laurel protests that the State had no authority to enforce the terms of the stall agreement and that the State did not "put its weight" behind the eviction.  Mountain Laurel's argument misses the critical features of this case: the presiding racing judge and racing secretary, acting in their official capacities, [p]articipated in the decision to expel Fitzgerald.  In so doing, the racing officials "put their weight" behind the challenged expulsion by telling Mountain Laurel that Fitzgerald was violating Commission Rules and by approving the ensuing expulsion.

***

26

> In the present case . . . the State did more than merely adopt a regulation prohibiting inconsistent driving.  Officials of the Racing Commission personally and actively participated in the specific conduct challenged by Fitzgerald.  Their opinion as "racing officials and judges" of Fitzgerald's conduct precipitated the ensuing summary expulsion. . . . [W]e conclude that the totality of the circumstances demonstrate that Mountain Laurel's eviction of Fitzgerald must be fairly considered as the disciplinary act of the State.

Id. at 598-99.

Plaintiff contends that similar to the facts in Fitzgerald, he was ejected from Parx based on violations of Commission rules.  (Doc. No. 12 at 12.)  He also relies on the fact that the Commission subsequently approved his ten-year ejection.[14]  (Id.)  Plaintiff mistakenly relies on Fitzgerald in support of his argument because the facts in Fitzgerald are inapposite to the facts in the instant case.  First, Plaintiff does not allege that any Commission officials personally and actively participated in his ejection.  Instead, he alleges that McDonnell, Parx's corporate counsel, dictated the wording of the Notice of Ejection, which Morell, Parx's Director of Security, subsequently signed and issued to Plaintiff.  (Doc. No. 1 at ¶ 50.)  As discussed more fully below, Morell was not acting as an agent of the State when he ejected Plaintiff from the racetrack.  Furthermore, the rule that permitted Plaintiff's ejection, 4 P.S. § 325.215(c), says nothing about the term of ejection and does not mandate how long individuals like Plaintiff should be ejected for.

Second, it was only after Plaintiff's ejection from Parx that the Commission approved the decision to remove Plaintiff for ten years.  Unlike the racing officials' direct input in Fitzgerald's ejection, the Commission's approval did not precipitate Plaintiff's ejection.[15]  The fact that the

---

[14] As noted throughout the Opinion, the Commission later reduced the term of ejection from ten years to thirty months.  This decision is currently on appeal before the Commonwealth Court of Pennsylvania.

[15] For the Third Circuit, this "sequence of events [was] crucial."  Fitzgerald, 607 F.2d at 598.

Commission reviewed Parx's decision and subsequently approved it is not the same as exercising

coercive power or providing such significant encouragement that the imposition of the ten-year

term of ejection can be fairly attributed to the State.  Because the State did not direct, encourage,

or actively participate in Plaintiff's ejection from Parx, no close nexus exists here.  See

Fitzgerald, 607 F.2d at 600 ("We perceive no question of a close nexus between state and private

action when the private activity, totally independent of any official state participation, results in

the discharge of a person for violation of state law.").  See also Redmond v. The Jockey Club,

244 Fed. App'x 663, 673-80 (6th Cir. 2007) (Clay, J., concurring) (collecting cases in which no

close nexus was found where the State was not intimately involved in the challenged private

conduct).  Accordingly, Parx is not a state actor under a close nexus theory.

### 3.      Plaintiff Fails to Allege that Morell is a State Actor

Finally, Plaintiff contends that Morell was acting as an agent of the State when he ejected

Plaintiff from the racetrack.  (Doc. No. 12 at 10-11.)  Specifically, he argues that Morell was

acting as a peace officer at the time of Plaintiff's ejection.  In support of this contention, Plaintiff

relies on the following Pennsylvania statute:

> The commissions and any licensed corporations are authorized and empowered to
> employ persons as security personnel.  These persons shall possess the powers
> and duties of a peace officer with respect to the enforcement of the criminal laws
> of the Commonwealth within the race meeting grounds or enclosure.  The
> designated persons are also authorized to interrogate and eject from the race
> meeting grounds or enclosure any persons suspected of violating any rule or
> regulation promulgated by the commissions.

4 P.S. § 325.215(a) (emphasis added).  Plaintiff's argument is unavailing.  Morell's actions

cannot be attributed to the state for two reasons.  First, Morell did not perform any law

enforcement functions when he issued the Notice of Ejection to Plaintiff.  Second, Morell was

not acting as a peace officer when he ejected Plaintiff because he was not enforcing a criminal

law.

Though not styled as such, Plaintiff essentially makes a public function argument by contending that a Pennsylvania statute delegates a public function (police protection) to a private entity (racetrack security personnel).  The "public function test," sometimes referred to as the "exclusive government function approach," is another means of establishing state action.  Under this test:

> [T]he relevant question is not simply whether a private group is serving a "public function." . . . [T]he question is whether the function performed has been "traditionally the exclusive prerogative of the State."

Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982) (quoting Jackson, 419 U.S. at 353.)  "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'"  Flagg Bros., 436 U.S. at 158.  The Supreme Court has noted the following with respect to police protection:

> [W]e would be remiss if we did not note that there are a number of state and municipal functions . . . which have been administered with a greater degree of exclusivity by States and municipalities than has the function of so-called "dispute resolution."  Among these are such functions as education, fire and police protection, and tax collection.  We express no view as to the extent, if any, to which a city or State might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment.

Id. at 163-64.  The Supreme Court has yet to resolve whether, and under what circumstances, private police officers or security personnel may be said to perform a public function for purposes of establishing Section 1983 liability.  However, in resolving a different issue,[16] the Court explained:

---

[16] In N.L.R.B. v. Jones & Laughlin Steel Corp., the Supreme Court considered whether private, deputized security guards constituted "employees" within the meaning of § 2(3) of the National Labor Relations Act.  331 U.S. 416 (1947).  The Court held that the security guards were employees within the meaning of the statute, despite their deputization as municipal policemen.  Id. at 431.

> It is a common practice in this country for private watchmen or guards to be vested with the powers of policemen, sheriffs or peace officers to protect the private property of their private employers.  And when they are performing their police functions, they are acting as public officers and assume all the powers and liabilities attaching thereto.

N.L.R.B. v. Jones & Laughlin Steel Corp., 331 U.S. 416, 429 (1947).

Federal courts have applied this reasoning and have reached the same conclusion in circumstances where privately employed security personnel performed traditional law enforcement functions pursuant to State authorization.[17]  These courts found state action to be present where the private security personnel performed traditional law enforcement functions such as carrying a gun, wearing a special badge or uniform, making arrests, and detaining and interrogating individuals suspected of committing crimes.

The present case is distinguishable because Plaintiff does not allege that Morell engaged in any law enforcement activity when he issued the Notice of Ejection to Plaintiff.  For instance,

---

[17] See Romanski v. Detroit Entm't, L.L.C., 428 F.3d 629 (6th Cir. 2005) (finding state action where state law gave plenary power to casino security personnel to make arrests and security guard detained, arrested, interrogated and ejected a patron suspected of theft); Rodriguez v. Smithfield Packing Co., Inc., 338 F.3d 348 (4th Cir. 2003) (finding state action where private employer's Chief of Security, who was also an auxiliary deputy sheriff, wore a deputy sheriff badge, had a sheriff's department radio and a gun, pepper sprayed, handcuffed, and escorted arrested employees to police cars); Austin v. Paramount Parks, Inc., 195 F.3d 715 (4th Cir. 1999) (finding state action where state law authorized "special police officers" employed by an amusement park to carry firearms, make arrests, and perform the same functions as state law enforcement officers, and a special police officer at the park caused two warrants to be issued for a park patron and assisted with his prosecution); Payton v. Rush-Presbyterian St. Luke's Med. Ctr., 184 F.3d 623 (7th Cir. 1999) (finding state action where pursuant to a city ordinance appointing and licensing two private hospital security guards as "special police officers," those guards beat, detained and arrested a hospital visitor); Henderson v. Fisher, 631 F.2d 1115 (3d Cir. 1980) (finding state action where pursuant to state law endowing campus police with the same powers as municipal police force, campus officer arrested defendant and removed exculpatory evidence).  See also Woodward & Lothrop v. Hillary, 598 A.2d 1142 (D.C. 1991) (collecting federal cases where state action was found when private security personnel engaged in law enforcement activity, pursuant to State grant of authority).

there are no allegations that Morell detained or arrested Plaintiff, interrogated him, or searched Plaintiff's person or property. Thus, there is no state action under the public function test.

For the same reasons that Morell is not a state actor under the public function test, Plaintiff's argument that Morell[18] was acting as a peace officer also fails. As quoted above, 4 P.S. § 325.215(a) delegates the powers and duties of a peace officer to security personnel like Morell "with respect to the enforcement of the criminal laws of the Commonwealth within the race meeting grounds or enclosure." The role as a peace officer is separate and apart from the authority to interrogate and eject licensees suspected of violating racing rules. For example, in Peterson v. Commonwealth, Pennsylvania State Horse Racing Comm'n, a racetrack's director of security acted in both capacities under the statute. 449 A.2d 774 (1982). While the director of security exercised his peace officer powers by frisking a saddle vendor for weapons, the court ultimately held that he "acted well within [his] authority in ejecting [the saddle vendor] from the race track" for violating various Commission rules. Id. at 780. By ejecting the vendor from the racetrack, the director of security was acting pursuant to his authority to uphold racing rules, rather than enforcing criminal laws. That is precisely what happened in this case.

Racetrack security personnel like Morell may act as peace officers in certain situations—namely, where they are enforcing a Pennsylvania criminal law. However, this case is not one of those situations. Here, there is no allegation that Morell was enforcing any Pennsylvania criminal law when he presented Plaintiff with the Notice of Ejection. In the related state court action, the Commonwealth Court even reiterated that "in order to eject a licensee, a licensed corporation need not demonstrate that the conduct underlying the ejection is

---

[18] Plaintiff does not contend that Francis McDonnell, Esquire, qualifies as a state actor under this provision. It appears that Plaintiff chose not to make this argument with respect to McDonnell because he is not security personnel for Parx.

criminal . . . ." Guerrero, 2013 WL 6578970 at *3.  Instead, Morell and the other Parx

Defendants had "clear authority" under 4 P.S. § 325.215(c) to eject Plaintiff from the racetrack

because his presence there was deemed to be detrimental to the best interests of horse racing.  Id.

at *4.  Applying the plain language of the statute, Morell was not acting pursuant to his duties as

a peace officer because he was not enforcing any criminal laws when he presented Plaintiff with

the Notice of Ejection.  Consequently, Plaintiff cannot establish Section 1983 liability based on

this theory.

Each of Plaintiff's three theories of state action in regard to the Parx Defendants are

unavailing.  Because Plaintiff cannot successfully allege that the Parx Defendants engaged in

state action when they ejected him, he would not be able to set forth a plausible Section 1983

claim.[19]  Accordingly, Count II of the Complaint will be dismissed.  Plaintiff will not be granted

leave to amend because doing so would be futile.

**D.    Tortious Interference Claim**

Lastly, Defendants argue that Plaintiff fails to state a plausible claim for tortious

interference with contract and business relationships.  (Doc. No. 3-2 at 14-20; Doc. No. 11-1 at

22-23.)  However, the Court need not address the merits of Defendants' final arguments.

Because the Court is dismissing all of Plaintiff's federal claims, it will decline to exercise

supplemental jurisdiction over this remaining state law claim.  See 28 U.S.C. § 1367(c)(3) ("The

---

[19] Having determined that the Parx Defendants were not state actors for purposes of Plaintiff's
Section 1983 claim, the Court need not consider whether Plaintiff was deprived of procedural
due process when he was not afforded a hearing in front of the Commission until twenty-seven
days after his ejection.  It is worth noting that none of the Parx Defendants are responsible for
scheduling hearings before the Commission.  If a licensee requests one, it is up to the
Commission to determine when a hearing will be held.  Therefore, even if Plaintiff could
establish the necessary state action requirement, it is unlikely that he could demonstrate that
any of the Parx Defendants denied him procedural due process since they were not the ones
who scheduled Plaintiff's hearing twenty-seven days after his ejection.

district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction").  Thus, Count III of the Complaint will be dismissed as well.

## V.      CONCLUSION

For the aforementioned reasons, Defendants' Motions to Dismiss (Doc. Nos. 3, 11) will be granted.  Plaintiff's Complaint (Doc. No. 1) will be dismissed in its entirety, and leave to amend the Complaint will not be granted.  An appropriate Order follows.